NATIVE VILLAGE OF STEVENS; Native Village of Allakaket; Dinyea Corporation, Appellants,

v.

Lennie GORSUCH, Commissioner; Jerry L. Brossia, Regional Manager; and Alaska Department of Natural Resources, Appellees.

No. S–4023.

Supreme Court of Alaska.

March 29, 1991.

Eric Smith, Anchorage, for appellants.

Cameron M. Leonard, Asst. Atty. Gen., Fairbanks, Douglas B. Baily, Atty. Gen., Juneau, for appellees.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

PER CURIAM.

The judgment is affirmed on the memorandum decision of the superior court appended hereto.[1]

## APPENDIX

## MEMORANDUM DECISION

This is an appeal from a decision of the Department of Natural Resources to hold a

land disposal at Cascaden. The appellants, Native Village of Stevens, Native Village of Allakaket, and Dinyea Corporation [Villages] contend that the disposal is inconsistent with the Tanana Basin Area Plan [TBAP] and thus violative of state law. The Villages further allege that the Department of Natural Resources' finding that the Cascaden disposal would not adversely affect subsistence uses is not supported by the record. Jurisdiction is vested in this Court pursuant to AS 22.10.020(d).

## FACTS

In October of 1982, the Department of Natural Resources [DNR] held a public meeting in Livengood, Alaska, to discuss the development of a land disposal in the Livengood area. Those in attendance were generally in favor of a disposal, requesting homesites if possible. This interest was again displayed in February of 1984, when DNR received a petition requesting homestead land in the Livengood area. In March of 1984, DNR tentatively identified a portion of Cascaden Ridge for disposal.[1]

DNR nominated 800 acres in Cascaden as homestead land in November of 1984. Public comments were requested and a meeting held in Livengood to discuss this nomination. As a result of the attendees' concerns, DNR decided that the needs of the Livengood population would be better met by a subdivision disposal, with approximately 50% of the lots to be homesites.

The Cascaden Preliminary Decision was issued in July of 1985. This Decision proposed the sale of 600 acres over a period of at least three years, with subdivision lots of approximately five acres in size. Following additional comments received by the

---

1. The only point on appeal not covered in the memorandum decision concerns the appellees' motion to strike. This point lacks legal significance because the exhibit stricken would not have changed the result of the litigation had it been considered.

1. The Cascaden disposal is located approximately 85 miles northwest of Fairbanks and eight miles southwest of Livengood between miles 77 and 82 of the Elliot Highway.

public,[2] DNR decided to limit the first offering to 200 acres.

The final subdivision design was finished in the spring of 1986. The initial phase of the disposal was to consist of 13 subdivision lots and 18 homesite lots. The disposal was to take place in May of 1988. The final finding of the DNR reduced the initial offering to 165 acres, with the same allocation between subdivision lots and homesite lots.

In February of 1988, Stevens Village again requested that the Cascaden disposal be reduced, this time to ten lots. The Tanana Chiefs Conference joined in this request in April of 1988. Similarly, the state legislature requested that the Cascaden disposal be limited to ten lots. On October 31, 1989, DNR acquiesced in these requests and amended the Final Finding, limiting the disposal to ten lots, all of which would be homesites. Having the disposal amended to meet their demands, the Villages now challenge the disposal in this appeal.

## DISCUSSION

In reviewing DNR's decision to dispose of the land at Cascaden, the appropriate standard of review is that of the "reasonable basis." This limited review is appropriate when a court considers "an administrative agency's decision where questions of fact and law involve agency expertise and/or broad policy considerations." *State v. Weidner*, 684 P.2d 103, 108 n. 4 (Alaska 1984) (citations omitted). As the land disposal decision in the instant case involves

both policy considerations and agency expertise, a matter committed to DNR's discretion, this Court's review is confined to determining "whether the decision was arbitrary, unreasonable, or an abuse of discretion." *North Slope Borough v. LeResche*, 581 P.2d 1112, 1115 (Alaska 1978) (footnote omitted).

DNR has both the broad authority and the duty under Title 38 of the Alaska Statutes to dispose of state land. With two exception not applicable to the instant case, DNR must develop regional land use plans to provide for the use and management of state-owned land pursuant to AS 38.04.065. After such a plan is adopted, the land must be classified consistent with the plan. The TBAP classification scheme consists of agriculture, fish and wildlife, forestry, recreation, settlement, and subsurface resources. Following the classification, any disposals inconsistent with the plan may not be implemented until the plan is amended.[3] The TBAP defines an amendment as that which modifies or adds to the basic intent of the plan.

The land at issue was classified as "settlement" in the TBAP, under the name of "Westridge." The TBAP further references the land at Cascaden as follows:

Land for Community Expansion

The state owns land for community expansion near the communities of Tofty, Livengood and Eureka, but it does not own land that could be used for community expansion purposes in Manley or Minto. Due to the small population in Tofty, Livengood and Eureka, very limited land sales are recommended in these areas.

A disposal in an area recommended for retention;
Retention of an area recommended for disposal;
Changing the classification of an area from resource management to agriculture.

---

2. Appellant Stevens Village at the time requested that only 20 lots be sold and no over-the-counter sales be offered.

3. The TBAP lists the following examples of changes which would require an amendment:
A proposal to close an area to mineral entry;
Allowing a use in an area where it is currently prohibited;

LAND RECOMMENDED FOR SALE
FOR COMMUNITY EXPANSION

| Project | Net Acres |
|---|---|
| Eureka Community I | 100 |
| Eureka Community II | 100 |
| Tofty I | 100 |
| Tofty II | 100 |
| Total | 400 |

Land for Recreational Use and Self–Sufficient Living.

. . . .

The state land between Fairbanks and Livengood is more desirable for settlement. These areas are closer to Fairbanks, and are adjacent to the Steese White Mountain Recreation Area. In this area, several fee homestead areas and subdivisions will be offered for sale.

LAND RECOMMENDED FOR SALE
FOR RECREATIONAL SUBDIVISIONS

| Project | Net Acres |
|---|---|
| Kentucky Creek (Over–the–Counter, as of 5/84) | 543 |
| Deadman Lake (Over–the–Counter, as of 5/84) | 533 |
| Westridge I | 100 |
| Westridge II | 100 |
| Westridge III | 200 |
| Tatalina I | 100 |
| Tatalina II | 200 |
| Hutlitakwa | 1,400 |
| Total | 3,176 |

LAND RECOMMENDED FOR SALE
FOR RECREATIONAL HOMESTEADS

| Project | Net Acres |
|---|---|
| Dugan Hills (Over–the–Counter, as of 5/84) | 7,000 |
| Cosna Lower I | 3,000 |
| Cosna Lower II | 3,000 |
| Westridge I | 1,000 |
| Westridge II | 1,000 |
| Westridge III | 4,500 |
| Snoshoe Pass I | 500 |
| Snoshoe Pass II | 500 |
| Snoshoe Pass III | 500 |
| Tatalina | 500 |
| Chitanana | 850 |
| Globe Creek | 1,000 |
| Total | 23,350 |

While conceding that Cascaden was designated and classified as settlement, the Villages argue that the recommended number of acres and style of disposal set out in the TBAP binds the DNR to dispose of the precise disposals referred to in the plan. DNR contends that it is within their discretion to dispose of state lands in any configuration necessary to implement policy considerations, as long as the disposal area is classified as settlement and procedural guidelines are followed.

The TBAP sets out the preliminary decisions on land use actions on state lands within the Basin. The permissible uses, including private sales, are found in the TBAP. The ultimate design of a particular disposal is the province of the Land Availability Determination System (LADS).

Appellants assert that the disposal of homesites instead of homesteads is a significant change requiring an amendment of the TBAP. The TBAP itself does not distinguish between subdivisions and homesites. As such, this Court does not find that the Cascaden disposal is inconsistent with the TBAP. Whether the disposal is of homesites or homesteads is not determinative as long as the land has been classified as settlement land. The references to which the Villages point are merely recommendations and are not binding upon the DNR. To sell homesites instead of homesteads does not change the basic intent of the plan and, as such, does not require amendment of the plan.

The Villages further allege that disposals for the purpose of community expansion, as was undeniably the case with Cascaden, are prohibited in Livengood by the TBAP.

The TBAP does not, however, forbid such disposals. The TBAP does not exclude the possibility of community expansion disposals in the Livengood area. Instead, the TBAP recommends limited land sales because of the small populations in the area. Again, this is not the type of change that would mandate amendment of the plan because the basic intent, i.e. settlement, of the Plan is still being effectuated.

■ The Cascaden community desired the sale of homesites. Because the land was classified as land available for settlement, it was reasonable for the DNR to heed the wishes of the population and dispose of land consistent with both the TBAP and community needs, just as it was proper for DNR to reduce the scope of the disposal in response to the concerns voiced by the Villages. The Cascaden disposal is consistent with the TBAP. The decision of the DNR was not, therefore, arbitrary, unreasonable, or an abuse of discretion.

■ The Villages next contend that the record does not support DNR's finding that the Cascaden disposal would have minimal impact on their subsistence life style. While the Department of Fish and Game has the primary responsibility for the regulation and management of wildlife and subsistence uses, AS 38.05.830 mandates that the DNR look to such concerns when disposing of state lands. AS 38.05.830 provides:

> Land disposal in the unorganized borough. Before a sale, lease under AS 38.05.070–38.05.105, or other disposal of state land in the unorganized borough, the commissioner shall consider the effect that the sale, lease, or other disposal may be expected to have on the density of the population in the vicinity of the land, and potential for conflicts with the traditional uses of the land that could result from the sale, lease, or disposal. If necessary, the commissioner shall develop a plan to resolve or mitigate the conflicts in a manner consistent with the public interest and provisions of this chapter.

In efforts to comply with this requirement, DNR's proposal for the Cascaden disposal was prepared so as to be consistent with the TBAP. The TBAP was, and remains, DNR's most significant mechanism to reconcile land use conflicts. These potential conflicts were carefully considered during the planning stages of the TBAP.

Moreover, DNR did not rely solely upon the TBAP in deciding that the Cascaden disposal would have a minimal impact on subsistence lifestyles. An "impact/benefit analysis" was conducted which demonstrated that "except for a slight increase in hunting pressure by the local populations, the disposal of Cascaden will have minimal impacts on [sport/subsistence hunting] activities." DNR noted that the closest village not favoring the disposal was approximately 100 miles from Cascaden.[4] DNR also relied on a draft DF & G subsistence report which noted that 90% of the Village's resource harvest was fish, a harvest that the Cascaden disposal would affect only slightly.

In addition, DNR anticipated only a small increase in population on the basis of the realistic expectation that some of these lots would be purchased by persons already residing in the Livengood area. While DNR can not constitutionally limit the acquisition of land to local residents,[5] it was concluded that the instant disposal would best meet the Livengood community's needs.[6]

The record supports DNR's conclusion that the Cascaden disposal will allow for community expansion of Livengood. DNR encouraged local participation and reasonably believed that the homesite disposal would provide land for Livengood residents as well as all other interested Alaskan citizens.

## CONCLUSION

There is substantial evidence in the record to support DNR's finding that the

---

4. The nearer village of Minto favored the Cascaden disposal.

5. See *Gilman v. Martin,* 662 P.2d 120 (Alaska 1983).

6. It is worthy of note that the Villages are now faced with the exact disposal design that they themselves requested: ten homesite lots. It is disingenuous for them to now complain that such a decision is unreasonable or arbitrary.

Villages' subsistence life styles would be minimally affected by the Cascaden disposal. There was a reasonable basis for the decision by DNR to hold the land disposal at Cascaden. The decision was not unreasonable, arbitrary, or an abuse of discretion. The Decision of the DNR is hereby affirmed.

DATED at Fairbanks, Alaska, this 24 day of May, 1990.

/s/ Richard D. Savell
RICHARD D. SAVELL
Superior Court Judge